IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES FOUNTAS, as Independent Administrator of the Estate of G.P., deceased, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF OAK FOREST, et al., <br><br> Defendants. | Case No. 1:14-cv-03174 <br><br> Hon. Charles R. Norgle |

## ORDER

Defendant City of Oak Forest's motion for summary judgment [75] is granted.

## MEMORANDUM OPINION

Gina Presley tragically died on March 27, 2013, twelve days after her third birthday, from abuse inflicted by Jessie Rodriguez, for which Rodriguez was convicted of murder. Dkt. 88 at ¶¶ 7, 9-11. Plaintiff, James Fountas, Gina's paternal grandfather and the administrator of Gina's estate, sued the City of Oak Forest and the Illinois Department of Children and Family Services ("IDCFS") in Illinois state court for wrongful death claims under Illinois law as well as a claim against the City under 42 U.S.C. § 1983, which the City removed to this Court under 28 U.S.C. § 1441(a). Dkt. 1. Once here, Plaintiff voluntarily dismissed IDCFS as a defendant, Dkt. 25, and filed an amended complaint against the City, also adding Kim DeBartolo and Jessie Rodriguez as defendants, Dkt. 37. Plaintiff later voluntarily dismissed the individual defendants, Dkt. 69, leaving the City as the sole remaining defendant against which Plaintiff asserts a state law wrongful death claim and a claim under 42 U.S.C. § 1983, Dkt. 37. Before the Court is the City's motion

for summary judgment on both of Plaintiff's claims against it. Dkt. 75. As explained below, the City's motion for summary judgment is granted.

## I. BACKGROUND

The following facts are undisputed. At the time of Gina's death, Gina lived in Oak Forest, Illinois with her guardian and maternal great aunt, Kim DeBartolo, and Rodriguez, who began dating DeBartolo in December 2012. Dkt. 88 at ¶¶ 12-14. Starting in early 2013, Gina's extended family began to note concerns about Gina's health and living situation.

Gerald Presley, Gina's maternal grandfather, noticed that beginning in January 2013, Gina was "getting sick all the time" and her hair started thinning. Dkt. 88 at ¶ 16. At around the same time, Jacqueline Presley, Gina's maternal great-grandmother, noticed Gina's thinning hair as well as bruises on Gina's cheeks, back, and buttocks. Dkt. 94 at ¶ 1. In February 2013, Jacqueline saw DeBartolo grab Gina at the top of Gina's hair and shake Gina's head back and forth in the bathroom. Dkt. 94 at ¶ 3. In early March 2013, Jacqueline was told by Gina that Rodriguez poured cold water on her back. Dkt. 94 at ¶ 2. James Fountas, Gina's paternal grandfather, noticed Gina's thinning hair too. Dkt. 94 at ¶ 13. After DeBartolo took Gina to a doctor about her thinning hair, James was informed that the doctor diagnosed Gina with alopecia. Dkt. 88-4 at 2. James and his wife, Suzanne Fountas, considered taking Gina to another doctor for a second opinion. Id.

Gerald visited Gina, DeBartolo, and Rodriguez at their home on February 23, 2013, where he noticed a marijuana-like smell, but did not observe marijuana or other drugs. Dkt. 88 at ¶ 19. Soon after, Gerald mentioned the smell to his brother John Presley, a police officer in Steger, Illinois, who advised Gerald to call IDCFS if he had concerns. Dkt. 88 at ¶¶ 21-22. Gerald followed John's advice and called to the IDCFS hotline. Dkt. 76-4 at 13 (46:24-47:24). On March 3, 2014, Jacqueline observed two bruises on Gina's buttocks while babysitting Gina at her home in Crete,

2

Illinois. Dkt. 88 at ¶¶ 23-24. At Jacqueline's request, John drove to Jacqueline's home to observe Gina's bruises. Dkt. 88 at ¶¶ 25, 29. John observed "a fading 'straight line bruise'" on Gina's buttocks but did not think the bruise appeared to be abuse and took no further action. Dkt. 88 at ¶¶ 29-31. Jacqueline told Gerald about the bruises she observed, and Gerald again talked to John about the issue. Dkt. 76-4 at 14 (49:7-50:20). John again advised Gerald to call IDCFS, which Gerald did on March 4, 2013. Dkt. 76-4 at 14 (50:23-51:11).

On March 11, 2013, Gerald reported his, Jacqueline's, and John's observations about Gina's health and living situation to Sgt. Curlee of the Oak Forest Police Department. Dkt. 94 at ¶ 7. Gerald's intent in his conversation with Sgt. Curlee was to motivate the police to perform a wellness check on Gina. Dkt. 88 at ¶ 38. But Gerald only asked Sgt. Curlee, "what can you do about it?" to which Sgt. Curlee responded, according to Gerald, "something about there's only so much you can do." Dkt. 76-4 at 16 (58:14-58:16). Sgt. Curlee also advised Gerald to call IDCFS. Dkt. 76-4 at 16 (58:17-59:5). Gerald followed Sgt. Curlee's advice and again called the IDCFS hotline. Dkt. 76-4 at 16 (59:9-59:16; 60:19-60:24). Oak Forest Police Department took no further action that day as to Gina or to Gerald's report about her. Dkt. 94 at ¶¶ 9-10.

The Presley family held a birthday party for Gina on her third birthday, March 15, 2013. Dkt. 88 at ¶ 41. At the party, Gerald saw "some marks" "here and there on [Gina's] arms" that "didn't look too severe," Dkt. 76-4 at 20 (76:20-76:23), but did not see any evidence of physical abuse, Dkt. 88 at ¶ 43. Jacqueline made a statement to police after Gina's death that she observed bruising on Gina's right cheek at Gina's March 15, 2013 birthday party. Dkt. 94 at ¶ 11; Dkt. 88-6 at 2. But Jacqueline acknowledged in her deposition in this case that Gina did not have any bruising or marks on her face at the party. Dkt. 77-2 at 13 (45:15-45:17), 22 (83:14-84:5). The Fountas family held a birthday party for Gina on March 17, 2013. Dkt. 88 at ¶ 45. Suzanne, Gina's

3

paternal grandmother, noticed two small bruises on Gina's buttocks while she helped Gina go to the bathroom. Dkt. 94 at ¶ 12. Suzanne did not make any conclusions about the origin of the bruises and neither James nor Suzanne contacted IDCFS or the Oak Forest Police Department after the party. Dkt. 88 at ¶¶ 49-50.

On March 19, 2013, Jacqueline attended Alsip Nursery with DeBartolo and Gina. Dkt. 88 at ¶ 51. Jacqueline did not observe any bruises on Gina and reported that Gina was very happy. Dkt. 88 at ¶ 52. On the same day, a registered nurse who treated Gina's former babysitter reported to IDCFS the babysitter's concerns for Gina's health, safety, and living conditions. Dkt. 88-3 at 2. According to the nurse, the babysitter attended Gina's birthday party, where she observed bruises on Gina's buttocks and back and where Gina "begged [the babysitter] not to leave her." Id. The nurse also reported that the babysitter noted that Gina's hair began falling out with no explanation and that Rodriguez had poured cold water onto Gina, which aggravated her asthma. Id. The nurse further reported that the babysitter indicated Rodriguez had felony drug convictions, that drugs were kept in the house, and that the windows of the house were covered with cardboard. Id.

In the evening of March 19, the IDCFS investigator assigned to the file spoke with the babysitter by phone. Dkt. 76-6 at 11-12 (40:14-43:11); Dkt. 88-3 at 8. The babysitter told the IDCFS investigator that she was Gina's babysitter for about two years but that she no longer saw Gina. Id. The babysitter denied seeing Gina at her birthday party or claiming she observed bruises on Gina's body. Id. But the babysitter confirmed that Gina had lost hair and stated that DeBartolo informed her that the cause was alopecia. Id.

Shortly before the IDCFS investigator's conversation with the babysitter, at about 7:30 p.m., the IDCFS investigator made a request to the Oak Forest Police Department for a well-being check on Gina at DeBartolo's residence based on Gina's age and the nature of the nurse's report,

4

noting the allegations that Gina had bruises and that there were drugs in the residence. Dkt. 88 at ¶ 53; Dkt. 94 at ¶ 18; Dkt. 77-6 at 9-10 (29:2-29:5, 31:1-35:12); Dkt. 88-2 at 4; Dkt. 88-3 at 6. The IDCFS investigator did not provide any locations to look for Gina other than DeBartolo's residence. Dkt. 88 at ¶ 54.

Soon after the IDCFS investigator's request to the Oak Forest Police Department for a well-being check on Gina, Oak Forest police officers Jason Reid and Adrian O'Donnell were dispatched to DeBartolo's residence. Dkt. 88 at ¶ 56; Dkt. 94 at ¶ 19; Dkt. 88-2 at 4-5. The police officers arrived minutes later and observed that the residence was dark. Dkt. 88 at ¶¶ 59-60. The police officers rang the doorbell and knocked on the door but received no response. Dkt. 88 at ¶ 61-62. The police officers also tried to look through the residence's windows, at least one of which was covered, and walked around the perimeter, but did not notice anything unusual or outwardly apparent that there was a problem in the residence. Dkt. 88 at ¶¶ 62-63; Dkt. 88-5 at 13 (49:15-50:24). The police officers then notified dispatch of their observation that the residence was dark, and no one was home. Dkt. 88 at ¶ 64.

No Oak Forest police officer saw or spoke with Gina, DeBartolo, or Rodriguez on March 19, 2013. Dkt. 88 at ¶¶ 65-67. Nor did the police officers write a report. Dkt. 94 at ¶ 26. The Oak Forest Police Department does not have any policies or general orders that address when a patrol officer is required to write a report. Dkt. 80-2 at 12 (44:11-44:21); Dkt. 88 at ¶ 76; Dkt. 94 at ¶ 34. Rather, whether a patrol officer writes a report on a call depends on the circumstances and information gathered. Dkt. 80-2 at 12 (44:11-44:21); Dkt. 88 at ¶ 77; Dkt. 94 at ¶ 34.

The following day, on March 20, 2013, the IDCFS investigator followed up on her request for a well-being check on Gina and was informed that the dispatched police officers did not make contact with Gina. Dkt. 77-6 at 12-13 (44:8-48:12); Dkt. 88 at ¶ 69; Dkt. 88-3 at 9. The IDCFS

investigator also asked the dispatcher if there were any other complaints or reports about DeBartolo's residence, in response to which the dispatcher informed the IDCFS investigator that an uncle asked for advice on March 11, 2013. Dkt. 77-6 at 13 (46:21-47:17). The IDCFS investigator visited DeBartolo's residence on March 20, 2013. Dkt. 88 at ¶ 70; Dkt. 88-3 at 10. No one answered the IDCFS investigator's knock on the door, so the IDCFS investigator did not see or speak with anyone at the residence and instead left a letter requesting contact. Dkt. 88 at ¶¶ 71-72. The IDCFS investigator did not request further assistance from the Oak Forest Police Department. Dkt. 88 at ¶ 73.

On March 21 and 22, 2013, Gina had unexcused absences from her preschool. Dkt. 94 at ¶ 27. On March 22, DeBartolo took Gina to an urgent care facility in Tinley Park, Illinois for stomach flu symptoms. Dkt. 88 at ¶ 74. The doctor who examined Gina did not note any bruising. Dkt. 88 at ¶ 75. Gina's preschool marked Gina as on vacation beginning on March 25, 2013. Dkt. 94 at ¶ 28. Late in the evening on March 26, 2013, the Oak Forest Fire Department responded to an emergency dispatch for an ambulance to Gina's residence with DeBartolo and Rodriguez with information that Gina was choking on vomit. Dkt. 88-2 at 7-8; Dkt. 88-12 at 1. Gina was taken by ambulance to the Palos Community Hospital emergency room. Dkt. 88-12 at 1. At about 12:00 a.m. on March 27, 2013, the Oak Forest Police Department dispatched patrol officers to Palos Community Hospital after learning from dispatch that Gina was "in full arrest with bruises on her body." Dkt. 88-2 at 7-8; dkt. 88-12 at 1. Gina died before the patrol officers arrived. Dkt. 88-12 at 1-2. The report of Gina's autopsy from March 27, 2013 noted Gina's hair loss; bruises on Gina's forehead, face, forearms, hands, back, flanks, and buttocks; hemorrhages by many bruises; and subdural hematoma. Dkt. 32 at ¶ 32. The autopsy report concluded that the cause of Gina's injuries

and death was blunt force trauma due to child abuse. Dkt. 88-13 at 7. Rodriguez was ultimately convicted of homicide for causing Gina's death. Dkt. 88 at 11.

## II. LEGAL STANDARD

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Rather, the Court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id.

## III. ANALYSIS

The City moves for summary judgment on both claims Plaintiff asserts against it. The City first addresses Plaintiff's § 1983 claim in Count II of Plaintiff's Amended Complaint, arguing that Plaintiff cannot establish a constitutional deprivation or a *prima facie* Monell claim. As to Plaintiff's state law wrongful death claim in Count I, the City argues that it is entitled to absolute immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 Ill. Comp. Stat. 10/1-101 *et seq.*, and, in any event, it owed no duty to Gina. The Court agrees with the City on all points.

7

## A. The City is entitled to summary judgment on Plaintiff's § 1983 claim because Plaintiff cannot establish a constitutional deprivation or a *prima facie* Monell claim.

Municipalities like the City "can be held responsible [under §1983] for constitutional violations only when they themselves caused the deprivation of rights." J.K.J. v. Polk County, 960 F.3d 367, 377 (7th Cir. 2020) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 691-92 (1978)). So-called Monell liability is difficult to establish: Plaintiff must show that a municipal policy or custom caused the constitutional injury. Id. "The critical question under Monell remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" Glisson v. Indiana Dep't of Corrs., 849 F.3d 372, 381 (7th Cir. 2017). "A municipal action can take the form of an express policy (embodied, for example, in a policy statement, regulation, or decision officially adopted by municipal decisionmakers), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality." J.K.J., 960 F.3d at 377.

The City argues that Plaintiff cannot identify any such action attributable to it but also argues a more fundamental point: that Plaintiff cannot establish a constitutional deprivation. On the latter point, the City relies almost exclusively on DeShaney v. Winnebago Cnty. Dept. of Social Servs. in which the Supreme Court held "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. 189, 197 (1989). Plaintiff concedes the general point but argues that the exception for state-created dangers applies. The state-created dangers exception applies "when a public official 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'" Estate of Her v. Hoeppner, 939 F.3d 872, 876 (7th Cir. 2019). The exception is "quite narrow and reserved for 'egregious' conduct by public officials." Id. It "requires proof of three elements: (1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the

8

government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" Id.

Plaintiff argues that the first element is satisfied because the City "failed to establish any policies for the police to follow when they are responding to a call for a possible abuse victim." Dkt. 89 at 10. In other words, according to Plaintiff, the City's affirmative act that created or increased a danger to Gina was the City's failure to establish policies for responding to well-being checks. Id. at 10-11. Plaintiff does not cite any caselaw or other authority for the proposition that a failure to establish policies can constitute an affirmative act to satisfy the first element of the state-created dangers exception. The City, by contrast, argues that the exception is no longer valid after the Seventh Circuit's harsh treatment of it in Weiland v. Loomis, 938 F.3d 917, 919 (7th Cir. 2019). But the City's better argument is that the exception cannot apply on the record of undisputed facts in this case. The City, through its police department, did not affirmatively create or increase any danger to Gina. It took no action after Gerald's interaction with Sgt. Curlee on March 11, 2013 aside from advising Gerald to contact IDCFS. And though the City dispatched police officers to perform a well-being check on Gina at DeBartolo's residence on March 19, 2013 at the request of an IDCFS investigator, neither the dispatched police officers nor any other City official saw or spoke with Gina, DeBartolo, or Rodriguez on that day or any other time before Gina's death.

Because the undisputed facts support the conclusion that the City took no affirmative act that created or increased a danger to Gina, it follows that the City's failure to protect Gina did not cause Gina's death. Moreover, the City's conduct does not "shock the conscience." To conclude that Gina's death would have been averted if police officers had seen or spoken with Gina, DeBartolo, or Rodriguez before Gina's death is speculative and far from obvious. Importantly, conscience-shocking conduct "requires a culpable state of mind equivalent to deliberate

9

indifference" or criminal recklessness. Estate of Her, 939 F.3d at 876. The actions of Sgt. Curlee and the dispatched police officers do not rise to that level especially given the thin and ambiguous evidence of abuse or neglect that existed at the time of the events in question: Gina's thinning hair that might have been explained by alopecia, marks and bruises on Gina's body that no one recognized as likely signs of abuse, and intimations of drug use at DeBartolo's residence supported only by Gerald's assertion that he noticed a marijuana-like smell on February 23, 2013. As a result, the Court concludes that Plaintiff cannot establish that the City caused a constitutional deprivation based on the evidence in the record.

    The City is also correct that Plaintiff cannot identify a municipal policy or custom of the City that caused any such constitutional injury, to the extent one exists, sufficient to establish Monell liability. Plaintiff argues that a genuine issue of material fact exists as to Monell liability because, according to Plaintiff, the City has failed to establish a policy for investigating complaints involving allegations of child abuse and neglect, and has a pattern and practice of not investigating such complains. "The most straightforward Monell claims are those in which a plaintiff alleges that an affirmative municipal action is itself unconstitutional." J.K.J., 960 F.3d at 377. But Monell liability may also attach on a theory rooted in municipal inaction. Id. at 378. However, "the path to Monell liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." Id. A failure to act amounts to municipal action for Monell purposes only if the municipality "has notice that its program will cause constitutional violations." Id. at 379. "Demonstrating that notice is essential to an ultimate finding and requires a 'known or obvious' risk that constitutional violations will occur." Id.

10

Establishing notice that municipal inaction will cause constitutional violations can be done in two ways: (1) "proof of a prior pattern of similar constitutional violations" or (2) "circumstances in which 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights' that a factfinder could find deliberate indifference to the need for training." Id. at 380 (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)). Plaintiff, however, argues neither path. Plaintiff does not provide any evidence of a pattern of similar purported constitutional violations regarding the City's failure to investigate allegations of child abuse or neglect. And Plaintiff expressly disclaims any failure to train argument. Dkt. 97 at 2 ("Plaintiff is not asserting a failure to train argument").

Rather, Plaintiff argues that the City, through its Police Department, was on notice of the risks of harm to children who are subjected to child abuse and, more specifically, the risk of harm to Gina through the conversation Gerald had with Sgt. Curlee on March 11, 2013 and the IDCFS investigator's request for a well-being check on Gina on March 19, 2013. The evidence in the record reveals that the City and its Police Department did not have a specific policy on investigating allegations of child abuse or neglect, or on conducting well-being checks, but that is not enough. And the notice that Plaintiff claims the City had—generalized notice of the risks of harm to children who are subjected to child abuse and specific notice of the risk of harm to Gina— is not enough, even if accurate, to establish Monell liability by inaction. Accordingly, the City's motion for summary judgment on Plaintiff's § 1983 claim is granted.

**B. The City is entitled to summary judgment on Plaintiff's state law wrongful death claim because the City is absolutely immune from liability under the Tort Immunity Act and because it owed no duty to Gina.**

The parties agree that Plaintiff's wrongful death claim is governed by the Illinois Wrongful Death Act, under which Plaintiff must prove: "(1) [the City] owed a duty to the decedent; (2) [the

11

City] breached that duty; (3) the breach of duty proximately caused the decedent's death; and (4) that pecuniary damages occurred to persons designated under [the Act]." Rodgers v. Cook County, 998 N.E.2d 164, 172 (Ill. App. Ct. 2013). The City argues it is entitled to summary judgment because it is absolutely immune from liability under the Tort Immunity Act and because it owed no duty to Gina.

The City invokes four provisions of the Tort Immunity Act to support its argument that it is absolutely immune from liability. First, section 4-102, which provides immunity "for failure to establish a police department or otherwise to provide police protection or, if police protection is provided, for failure to provide adequate police protection service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 Ill. Comp. Stat. 10/4-102. Second, section 4-107, which provides immunity "for an injury caused by the failure to make an arrest or by releasing a person in custody." 745 Ill. Comp. Stat. 10/4-107. Third, section 2-103, which provides immunity "for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law. 745 Ill. Comp. Stat. 10/2-103. And fourth, section 2-109, which provides immunity "for an injury resulting from an act or omission of its employee where the employee is not liable." 745 Ill. Comp. Stat. 10/2-109.

Plaintiff claims that sections 4-102, 4-107, and 2-103 of the Tort Immunity Act do not apply because the City was enforcing the Illinois Domestic Violence Act, 750 Ill. Comp. Stat. 60/101 *et seq.*, and, as a result, the limited immunity of section 305 of the Domestic Violence Act applies instead. Section 305 of the Domestic Violence Act provides, "Any act of omission or commission by any law enforcement officer acting in good faith in rendering emergency assistance or otherwise enforcing this Act shall not impose civil liability upon the law enforcement officer or his or her supervisor or employer, unless the act is a result of willful or wanton misconduct." 750

12

Ill. Comp. Stat. 60/305. Plaintiff is correct that, to the extent the Domestic Violence Act is implicated, "the limited immunity of section 305 of the Act takes precedence over the blanket immunity of sections 4-102 and 4-107." Lacey v. Village of Palatine, 904 N.E.2d 18, 24 (Ill. 2009).

But the City retorts that the Domestic Violence Act is not implicated because, even if Gina was a "protected person" under the Act, the Act did not create a generalized duty for the City to protect her. "In order for the limited immunity provided for in section 305 to apply, the officer's act of omission or commission must occur while the officer is rendering 'emergency assistance or otherwise enforcing' the [Domestic Violence] Act." Lacey, 904 N.E.2d at 25. Like in Lacey, Plaintiff here does not contend that any officer rendered emergency assistance to Gina, "[t]herefore, the question is whether [the City was] 'otherwise enforcing' the Act . . . ." Id. "[T]he phrase 'otherwise enforcing' means that the police are giving effect to some portion of the Act under circumstances that cannot be considered an emergency." Id. at 26. "While the [Domestic Violence] Act can require police intervention under certain circumstances . . ., there is no generalized, open-ended duty to protect victims of domestic violence." Id. at 27. "Further, the [Domestic Violence] Act makes the necessity of police contact explicit through its delineation of law enforcement responsibilities in section 304." Id. at 28.

The Court finds that the City was not enforcing the Domestic Violence Act and, therefore, the limited immunity of section 305 does not apply. The City, through its police department, never saw or spoke with Gina, DeBartolo, or Rodriguez before Gina's death. And, as the City explains, even if the police officers dispatched on March 19, 2013 to perform a well-being check on Gina at DeBartolo's residence could be considered to have been enforcing the Domestic Violence Act, their enforcement concluded when the officers confirmed that there was no one at the residence. In that way, this case is significantly distinguishable from Moore v. Green, where the Illinois

13

Supreme Court concluded that the defendant police officers were enforcing the Domestic Violence Act when they failed to properly respond to a dispatch for police protection because the officers merely sat in front of the residence and left after three minutes, and the victim was shot and killed by her husband after only another five minutes. 848 N.E.2d 1015, 1019 (Ill. 2006). As the Illinois Supreme Court in Lacey held, a contrary ruling in this case "would create a situation where once officers were aware of the potential for violence, they would remain liable for the prevention of that violence for an indefinite period of time. Such a result would be contrary to the plain language of the [Domestic Violence] Act." Lacey, 904 N.E.2d at 29.

Accordingly, the Court concludes that the absolute immunity from liability in sections 4-102, 4-107, and 2-103 of the Tort Immunity Act apply and that the City is therefore immune from liability for Plaintiff's state law wrongful death claim. As such, the Court need not address the parties' arguments on the City's invocation of section 2-109. Alternatively, for similar reasons, the Court finds that the City also owed no duty to Gina and, therefore, Plaintiff's wrongful death claim fails on the merits. As explained above, the City has no constitutional duty to protect individuals against private violence. DeShaney, 489 U.S. at 197. And the Domestic Violence Act only imposes such a duty under specific circumstances and for discrete periods of time that are not applicable here. Lacey, 904 N.E.2d at 29. For those reasons, the City's motion for summary judgment on Plaintiff's wrongful death claim is granted.

## IV. CONCLUSION

The City's motion for summary judgment is granted as to both of Plaintiff's claims against it. The City is entitled to summary judgment on Plaintiff's § 1983 claim because Plaintiff cannot establish a constitutional deprivation or Monell liability. And the City is entitled to summary

judgment on Plaintiff's wrongful death claim because the Tort Immunity Act provides the City with absolute immunity and because the City owed no duty to Gina.

    IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: February 19, 2021